IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KIMBERLEY D. JOHNSON,
        Plaintiff,

v.                                                                          Civil Case No. 3:19-cv-521

LISA FLOYD, et al.,
        Defendants.

## OPINION

Kimberley Johnson worked for the Virginia Department of Juvenile Justice ("DJJ") as an English language learner ("ELL") trainer. Johnson had trouble determining the scope of her role and says she often did not receive the support she requested. After the DJJ extended Johnson's probationary period, Johnson resigned.

Johnson, proceeding pro se, has sued four DJJ employees,[1] alleging that they discriminated against her based on her race in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. Because the Court lacks jurisdiction over Johnson's § 1981 claims against the defendants to the extent she sues them in their official capacities for money damages, and because Johnson has otherwise failed to state a claim, the Court will dismiss this case.

### I. FACTS ALLEGED IN THE AMENDED COMPLAINT

Johnson, an African-American DJJ employee, became an ELL trainer on September 25, 2017. (*Id.*) Drewry, the principal at her facility, never sat down with Johnson or provided her with an employee work profile, apparently the equivalent of a job description. In October, 2017, Brooks, the Director of Curriculum and Instruction, began giving Johnson "directives." (Am.

---

[1] Specifically, Johnson has sued Lisa Floyd, George Drewry, Letha King-Brooks, and Emily Hill.

Compl., at 1.) Johnson also served on Brooks' ELL committee "to improve contributions to ELL students." (*Id.*) After Johnson told Brooks about incomplete, outdated, or missing ELL files, Brooks sent Johnson to talk to Ms. Pulley, the intake coordinator, to locate the files. Pulley did not know about various documents that should have been in the files, including limited English proficiency plans ("LEP plans"). Even though Johnson had worked on LEP committees before, Brooks directed Johnson to attend a training on LEP plans and to provide Brooks with a sample plan.

In November, 2017, Johnson arrived late to a staff meeting because the meeting email included the wrong location. Johnson attended a training on ELL testing the following day, after which she recommended to Hill that the DJJ administer the upcoming tests on computers to increase efficiency. At a staff meeting the next day, Floyd and Drewry privately asked Johnson why she was late to the staff meeting two days before. When Johnson explained the error in the email, Floyd responded, "[d]on't let it happen again." (*Id.* at 2.) Floyd then told the entire staff, "[s]orry we are a bit late, we needed to have a coming to Jesus meeting about [some things] here today with Ms. Johnson." (*Id.*) Johnson's colleagues later asked her what was going on after seeing Johnson visibly upset.

In December, 2017, Johnson was receiving directions from several people, but she did not know who her supervisor was. Drewry said Brooks was her supervisor, but Brooks said she was not. Johnson contacted human resources for clarification.

By January, 2018, Johnson was working as an ELL teacher, creating LEP plans and home language surveys, responding to requests from Hill about testing, and finishing reports for Brooks and Floyd. She was also scheduled for more ELL training. She still did not have a work profile and "began suffering from stress-related exhaustion and physical symptoms" because of her extra

work. (*Id.* at 3.) The day before the ELL training, Johnson's doctor told her to take time off to rest. Johnson did not attend the ELL training. Floyd later told the entire staff that they must attend all scheduled trainings and professional development events.

In February, 2018, Johnson administered the paper version of the ELL test. During the testing week, Drewry and Hill told Johnson to switch rooms several times, which required Johnson to move computers and materials. When Johnson asked Hill about room assignments and proctors, Hill responded, "try room 7 on Thursday." (*Id.*) Although other teachers had proctors to help them administer the test, Johnson only had a proctor for one day and otherwise administered the test without assistance.

Some students struggled to finish the test or refused to take the test. When one student called Johnson a "[b]itch," (*Id.* at 3), Johnson reported the incident to the assistant principal. Johnson also had to arrange an alternative time for Hill to pick up her students' tests due to these difficulties. After Johnson told Hill about her students' difficulties and refusals to complete the exams, Hill told Johnson that this had not happened the previous year and asked Johnson what she was doing differently. Johnson explained that some of the students had a history of refusing the testing and that she would work with her colleagues to complete the testing by the deadline. She also reminded Hill that she did not have a test proctor or security. Hill sent Johnson an email informing Johnson that she "had until March 30th to get the refusals to test or she would have to report this as a testing irregularity to [the Virginia Department of Education ("VDOE")]." (*Id.* at 4.) She also told Johnson to create a spreadsheet of the students who had refused to take the test and the reasons for the refusals.

Later that day, Johnson went to the emergency room for dizziness and exhaustion. The doctors told Johnson that she was "under [dire] stress" and that her job had caused Johnson's "severe neck strain, pinched nerves in [her] back[,] and stress[-]related exhaustion." (*Id.*)

In March, and April, 2018, Brooks told Johnson that she was writing Johnson's work profile. During that time, Johnson discovered that six new students had not received ELL services or received the required paperwork. Johnson tested the students and completed their paperwork. Johnson asked Drewry which staff member should have notified her of the new students and filled out their paperwork. Drewry did not respond.

On May 21, 2018, Johnson asked to meet with Brooks to discuss Hill. Johnson told Brooks that Hill asked for "lengthy [email] explanations" that interfered with Johnson's ability to help her students and would not meet with her face-to-face. (*Id.* at 4.) Johnson also reported that her coworkers had treated her unfairly for months. Brooks told Johnson that she was "taking notes about what [Johnson's] tasks are," and explained that she "wouldn't receive a write-up." (*Id.* at 4.) Brooks also said that she would arrange a meeting with Hill.

On May 25, 2018, Johnson received a nine-month performance review categorizing her as a "contributor" showing "consistent achievement toward meeting established performance expectations." (*Id.* at 5.) Brooks dated the review for March 28, 2018. Brooks and Johnson had met on March 28, 2018, but Johnson did not receive her work profile or performance review at that time. Johnson asked Brooks to correct the date to May 25, 2018.

In early June, 2018, Brooks told Johnson that she would conduct an eleven-month evaluation of Johnson, even though evaluations usually only occurred every three, six, nine, and twelve months. A white teacher also told Johnson that Brooks asked her if she was English as a second language ("ESL") certified. A week later, Johnson met with Brooks. Brooks asked

Johnson why testing scores were lower than in prior years and then tore a report up and shredded it. Brooks also gave Johnson a probationary progress review that categorized Johnson as "Below Contributor." (*Id.*) Johnson asked Brooks whether she had received this review because she had reported her difficulties with Hill and complained about "the emails and bullying." (*Id.* at 5.) When Brooks did not respond, Johnson declined to sign the review. Brooks said, "[w]ell this evaluation was for your protection," and told Johnson to "submit a rebuttal." (*Id.*)

In her rebuttal, Johnson explained that she did not have support in her position, was not offered proctors or security during testing, did not receive a work profile for months despite requesting one, felt harassed by Hill's emails, and could not fulfill her reporting or teaching responsibilities due to Hill's demands. She noted that Brooks had incorrectly dated her nine-month review and that she had to catch up on a tremendous amount of incomplete work when she started in the role.

Floyd and Brooks met with Johnson on June 14, 2018. They asked why she had waited to ask for a work profile and questioned Johnson's knowledge about compliance requirements. Floyd also told Johnson that the job was not the right fit and gave her two days to decide whether she wanted to extend her probation for two months[2] or resign with an employment reference.

On June 18, 2018, Johnson told Brooks that she wanted to extend her probation. Two days later, Brooks, Drewry, and Floyd gave Johnson a probation extension form to sign. They explained that they could fire her at any time for failing to meet expectations. Brooks also accused Johnson of forging a typed signature on an LEP plan that Johnson had given Brooks as an example and said that she could be fired for doing so. Johnson signed the probation extension form. On June 26,

---

[2] The Court cannot discern whether the DJJ extended Johnson's new-employee probationary period, or whether it extended a probationary period imposed due to poor job performance. In either scenario, however, the Court's analysis would remain the same.

2018, Johnson resigned effective July 2, 2018, describing in general terms "how [she] had been mistreated and retaliated against at DJJ." (*Id.* at 6.) She did not provide names or all of the details of the alleged mistreatment. Johnson contends that her white predecessor received more favorable treatment and did not have her "workload, . . . responsibility, and strict monitoring by [d]epartment [h]eads." (*Id.* at 5.) On June 27, 2018, the DJJ HR director told Johnson that she must make her resignation effective immediately.

Johnson alleges that the defendants have discriminated against her based on her race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

## II. LEGAL STANDARD

The defendants have moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12 (b)(6). A motion under Rule 12(b)(1) tests the court's subject matter jurisdiction. The plaintiff bears the burden of proving proper subject matter jurisdiction as the party asserting jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Eleventh Amendment immunity, which prevents an individual from suing a state, is a jurisdictional issue. *See Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 746-48 (4th Cir. 2018).

A Rule 12(b)(6) motion gauges the sufficiency of a complaint without resolving any factual discrepancies or testing the merits of the claims. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering the motion, a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). The principle that a court must accept all allegations as true, however, does not extend to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion to dismiss, a complaint must, therefore. state

facts that, when accepted as true, state a claim to relief that is plausible on its face. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When the plaintiff appears pro se, as Johnson does here, courts do not expect her to frame legal issues with the clarity and precision expected from lawyers. Accordingly, courts construe pro se complaints liberally. *See Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). This principle, however, has limits. *Id.* Courts do not need to discern the unexpressed intent of the plaintiff or take on "the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." *Id.*[3]

### III. DISCUSSION

#### A. Eleventh Amendment Immunity

Johnson alleges that Hill, Brooks, Drewry, and Floyd—state employees—violated § 1981 based on racial discrimination. "[W]hen suit is brought against a state actor, [42 U.S.C.] § 1983 is the 'exclusive federal remedy for violation of the rights guaranteed in § 1981.'" *Dennis v. Cty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701,

---

[3] Because Johnson proceeds *in forma pauperis*, the Court has the authority to dismiss this case "at any time" if it concludes that Johnson "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii); *see also De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). Although Floyd has not yet entered an appearance or moved to dismiss the case, the Court will consider whether Johnson states a claim for relief as to Floyd.

733 (1989)). Nevertheless, the Court liberally construes Johnson's complaint as asking this Court to enforce her rights protected by § 1981 under § 1983.[4]

The Eleventh Amendment guarantees "that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). Thus, "[a] suit generally may not be maintained directly against the State itself, or against an agency or department of the State, unless the State has waived its sovereign immunity." *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 684 (1982). The DJJ qualifies as a state agency and enjoys the privileges of immunity. *See* Va. Code Ann. § 66-1 *et seq.* (creating the DJJ through Virginia statute).[5] Johnson does not specify whether she brings this action against the defendants in their individual or official capacities. To the extent she asserts claims against the defendants in their official capacities, the Court treats Johnson's claims "as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Thus, the defendants also enjoy immunity as to those claims.

A claim against a state agency in federal court may overcome the Eleventh Amendment immunity bar when (1) Congress abrogates state immunity; (2) a plaintiff seeks only prospective or injunctive relief against a state agent; or (3) a state expressly consents to suit or waives its

---

[4] When an individual asserts a claim under § 1983 for rights protected by § 1981, the "§ 1981 claim in effect merges with § 1983, and courts treat the claims as a single claim." *Davis v. Durham Mental Health Developmental Disabilities Substance Abuse Area Auth.*, 320 F. Supp. 2d 378, 403 (M.D.N.C. 2004).

[5] *See also Boykin v. Virginia*, No. 3:14-cv-811-HEH, 2015 WL 5020896, at *10 (E.D. Va. Aug. 20, 2015), *aff'd sub nom. Boykin v. Va. Dep't of Juvenile Justice*, 641 F. App'x 221 (4th Cir. 2016) (per curiam) (describing the DJJ as "an agency of the Commonwealth").

immunity. *See Garrett*, 531 U.S. at 363; *Edelman v. Jordan*, 415 U.S. 651, 673 (1974); *Ex parte Young*, 209 U.S. 123, 159-60 (1908). The first and third exceptions do not apply here.[6]

Further, the second exception—the limited exception for injunctive or prospective relief against state officers in their official capacities—does not cover claims for money damages. *See Republic of Paraguay v. Allen*, 134 F.3d 622, 628 (4th Cir. 1998). Here, Johnson has requested compensatory and punitive damages and attorney's fees—forms of retrospective relief. *See id.* Thus, Eleventh Amendment immunity bars Johnson from suing the defendants in their official capacities to the extent she seeks money damages.

Johnson, however, also requests a letter of reference and future eligibility for rehire by the Commonwealth of Virginia. A plaintiff can sue state officers acting in their official capacities "when '(1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective.'" *Wicomico Nursing Home*, 910 F.3d at 746 (quoting *Allen*, 134 F.3d at 627).

The Court assumes that a letter of reference and eligibility for rehire amounts to prospective relief, so Eleventh Amendment immunity does not apply to the claims against the defendants in their official capacities insofar as she seeks those two forms of relief only.[7] *Cf. Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 243 (4th Cir. 2020) ("[C]laims for reinstatement to previous

---

[6] Congress did not abrogate states' Eleventh Amendment immunity through § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989). Nor has Virginia consented to suit or waived its immunity in this action. *Id.* at 66-69; *see, e.g.*, *Sansotta v. Town of Nags Head*, 724 F.3d 533, 546 (4th Cir. 2013). Accordingly, even if Johnson intended to assert claims against the DJJ pursuant to §§ 1981, 1983, the DJJ would be immune from suit.

[7] The Court cannot discern which defendant has the authority to provide Johnson with the prospective relief she seeks. *See Allen v. Coll. of William & Mary*, 245 F. Supp. 2d 777, 791 (E.D. Va. 2003) ("[The] [p]laintiff is entitled pursue a § 1983 claim against [the defendant] in her official capacity for injunctive relief in the form of reinstatement *provided that [the defendant] has the authority to provide for such relief*." (emphasis added)). Regardless, for the reasons set forth below, she has failed to state a claim as to any of the defendants under §§ 1981, 1983.

employment meet the *Ex Parte Young* exception."). Thus, the Court will only consider Johnson's §§ 1981 and 1983 claims to the extent that she asserts them against the defendants (1) in their official capacities for a letter of reference and eligibility to be rehired and (2) in their individual capacities.[8] In all other respects, the Court will dismiss Johnson's §§ 1981 and 1983 claims against the DJJ and the defendants without prejudice. *See Hong Tang v. Univ. of Baltimore*, 782 F. App'x 254, 256 (4th Cir. 2019) (per curiam).

### B. Improper Defendants

The defendants argue that the Court must dismiss Johnson's Title VII claims because she has not named the DJJ as a defendant. Indeed, Johnson has only named Floyd, Drewry, Brooks, and Hill—her supervisors and coworkers—as defendants in this action. "[S]upervisors are not liable in their individual capacities for Title VII violations." *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998). Thus, the Court will dismiss Johnson's Title VII claims against Floyd, Drewry, Brooks, and Hill with prejudice. The Court will construe Johnson's remaining Title VII as claims against the DJJ.[9]

### C. Remaining Claims

Applying the principles of liberal construction, the following claims remain: (1) hostile work environment claims against the DJJ in violation of Title VII (Count One), and against

---

[8] The defendants also argue that the Court lacks jurisdiction over Johnson's Title VII claims because she omitted relevant facts about her EEOC charge process. "Title VII's charge-filing requirement is a processing rule, . . . not a jurisdictional prescription delineating the adjudicatory authority of courts." *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1851 (2019). Thus, the defendants' argument falls under Rule 12(b)(6), not Rule 12(b)(1). In any event, because Johnson otherwise fails to state a claim, the Court need not reach this argument.

[9] The amended complaint does not indicate whether Johnson sues the defendants in their individual or official capacities, and at least one defendant appears to have left the DJJ. *See Briggs v. Waters*, No. 2:06-cv-154, 2006 WL 1982758, at *2 (E.D. Va. June 28, 2006) ("Because Waters no longer holds the office of Sheriff, he does not have an official capacity in which he can be

Drewry, Hill, Brooks, and Floyd, in violation of §§ 1981, 1983 (Counts Two to Five); (2) race-based disparate treatment claims against the DJJ in violation of Title VII (Count Six), and against Drewry, Hill, and Brooks, in violation of §§ 1981, 1983 (Counts Seven to Nine); (3) claims for failure to adequately investigate the alleged discrimination against the DJJ in violation of Title VII (Count Ten), and against Floyd in violation of §§ 1981, 1983 (Count Eleven); and (4) retaliation claims against the DJJ in violation of Title VII (Count Twelve), and against Brooks in violation of §§ 1981, 1983 (Count Thirteen). Because Johnson proceeds under the same facts for her claims under Title VII, § 1981, and § 1983, the Court will consider each set of claims together. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (noting that the same test applies under Title VII and § 1981); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 n.7 (4th Cir. 2002).

### 1. Hostile Work Environment Claim (Counts One to Five)

"Title VII prohibits racial . . . harassment that creates a hostile work environment for the harassed employee." *Bazemore v. Best Buy*, No. 18-2196, 2020 WL 1918702, at *3 (4th Cir. Apr. 21, 2020) (published opinion). To state a hostile work environment claim, a plaintiff must plead facts "show[ing] [that] she was subjected to (1) unwelcome conduct, (2) based on her race . . . , that was (3) severe or pervasive enough to make her work environment hostile or abusive and (4) imputable to . . . her employer." *Id.*

Johnson's complaint "must clear a high bar" to meet the severe or pervasive standard. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). To determine if conduct qualifies as severe or pervasive, courts consider the totality of the circumstances, including

---

sued."). Regardless, any suit against the defendants in their official capacities "is redundant" of a suit against the state agency. *See Malone v. Shenandoah Cty. Dep't of Soc. Servs.*, No. Civ. A. 5:04-cv-00114, 2005 WL 1902857, at *2 (W.D. Va. Aug. 9, 2005) (citing *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004)). Moreover, as the Court explains below, Johnson fails to state a claim for relief as to any defendant.

(1) frequency; (2) severity; (3) whether the conduct was physically threatening or humiliating, or merely an offensive utterance; and (4) whether the conduct unreasonably interfered with the plaintiff's work performance. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Sunbelt Rentals, Inc.*, 521 F.3d at 315. "[C]omplaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor are not actionable." *Id.* (internal citations and quotations omitted).

Here, Johnson alleges that the defendants were disorganized, withheld her work profile, failed to provide support during testing, sent emails that required lengthy responses, made demands of her without authority to do so, and threatened to report her to the VDOE. At most, Johnson's allegations show that she experienced "rude treatment," "callous behavior," and "personality conflict[s]" during her time at the DJJ, but those experiences fall short of a plausible hostile work environment claim. *Id.* Because Johnson has failed to plead that the defendants' conduct qualifies as severe or pervasive, the Court will dismiss Counts One to Five with prejudice.

### 2. *Disparate Treatment Claims (Counts Six to Nine)*

Johnson also contends that the DJJ, Drewry, Hill, and Brooks discriminated against her based on her race. To survive a motion to dismiss based on a disparate treatment theory, a plaintiff must allege "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action . . . ; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). Although a plaintiff need not "plead facts establishing a prima facie case of discrimination

to survive a motion to dismiss," she must nevertheless "state a plausible claim for relief." *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015). Johnson's complaint fails at the third and fourth prongs.

### a. Adverse Employment Actions

First, Johnson has not plausibly pled that she suffered an adverse employment action. "An adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). In addition to specific complaints about individual conduct,[10] Johnson alleges three adverse actions: (1) constructive discharge, (2) an extended probationary period, and (3) a poor performance review.

Because Johnson resigned, she must show that the defendants' conduct amounts to constructive discharge. *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 186 (4th Cir. 2004). To proceed on a constructive discharge theory, a plaintiff must plead facts showing "(1) the deliberateness of [the defendants'] actions, motivated by [discriminatory] bias, and (2) the objective intolerability of the working conditions." *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 425 (4th Cir. 2014). Johnson's allegations do not meet the "objective intolerability" standard because Johnson proceeds on the same factual allegations to support her constructive discharge claim as

---

[10] None of the individual actions Johnson alleges—withholding her work profile, failing to provide her with testing support, asking for lengthy explanations, making unauthorized demands of her, and threatening to report her to the VDOE—qualify as adverse employment actions. *Prince-Garrison v. Md. Dep't of Health & Mental Hygiene*, 317 F. App'x 351, 353 (4th Cir. 2009) (per curiam) ("[H]er employer's failure to provide her with office supplies, reprimands for insubordination, meetings with supervisors, and directions to attend counseling, do not constitute adverse employment actions.").

her hostile work environment claim. *See Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 162 (4th Cir. 2018) ("The 'intolerability' standard governing constructive discharge claims is more stringent than the 'severe [or] pervasive' standard for hostile work environment claims."). Thus, because her hostile work environment claim fails, her constructive discharge claim also fails.

Johnson's extended probationary period also does not qualify as an adverse employment action. Although the DJJ had the right to fire Johnson at any time during the extended probationary period, she does not allege that the extended probation resulted in "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). Rather, she remained in the same role as before with the same job responsibilities and pay until she resigned. Her extended probationary period, therefore, does not amount to an adverse employment action.

Finally, "a poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) (quotations omitted). Johnson has not plausibly pled a separate adverse employment action or that her evaluation "detrimentally alter[ed] the terms or conditions" of her employment. *Id.*

Accordingly, Johnson has failed to allege that she suffered an adverse employment action as to her disparate treatment claims.

### b. Similarly Situated Employees

Even if Johnson sufficiently pled an adverse employment action, Johnson has not sufficiently pled that "similarly-situated employees outside the protected class received more favorable treatment." *White*, 375 F.3d at 295. Johnson contends that her colleagues and supervisors treated her white predecessor better and gave her less work, and that Brooks asked a

white teacher whether she was ESL certified. But Johnson alleges no specific facts to support her conclusion that either her predecessor or colleague received more favorable treatment. *See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190-91 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of Appeals of Md.*, 566 U.S. 30 (2012). "[T]he complaint's allegations of race discrimination[, therefore,] do not rise above speculation." *Id.* at 191.

Accordingly, because Johnson has not plausibly pled the third and fourth elements of her disparate treatment claims, the Court will dismiss Counts Six to Nine with prejudice.

### 3. Failure to Investigate Claims (Counts Ten and Eleven)

Johnson also contends that Floyd, a formal decisionmaker, "failed to independently investigate" her complaints, and rubberstamped and agreed with her colleagues actions without considering "how [Johnson] was being discriminated against . . [,] treated differently[,] and harassed." (Am. Compl., at 8-9.) To assert a Title VII claim against a decisionmaker for failure to investigate a complaint or for "rubberstamping" a decision, however, the plaintiff must suffer an adverse employment action. *See CACI Premier Tech., Inc. v. Faraci*, 464 F. Supp. 2d 527, 534 (E.D. Va. 2006). As the Court has explained, Johnson does not allege such an action. Moreover, Johnson cannot assert a claim against Floyd for another employee's discriminatory actions under § 1983. *Love-Lane*, 355 F.3d at 782 ("[T]here is no respondeat superior liability under § 1983."). Thus, the Court will dismiss Counts Ten and Eleven with prejudice.

### 4. Retaliation Claims (Counts Twelve and Thirteen)

Finally, Johnson alleges that the DJJ and Brooks retaliated against her because she complained about Hill. She contends that Brooks gave her a "Below Contributor" performance

evaluation after she reported her conflicts with Hill and filed a rebuttal to her performance evaluation. She also alleges that Brooks gave her assignments with short deadlines.

To state a claim of retaliation, a plaintiff must allege "(1) engagement in a protected activity; (2) [materially] adverse employment action; and (3) a causal link between the protected activity and the employment action." *Coleman*, 626 F.3d at 190; *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Moreover, when a plaintiff alleges that she "was treated differently as a result of [her] race than whites," she must "establish a plausible basis for believing [the plaintiff and her white colleagues] were actually similarly situated or that race was the true basis for" the adverse employment action. *Coleman*, 626 F.3d at 191.

As explained above, Johnson has not plausibly pled that she has suffered an adverse employment action. But even if Johnson alleged an actionable adverse employment action, she has failed to show that she engaged in protected activity. Protected activity falls into two categories: (1) participating in an ongoing investigation under Title VII, or (2) opposing a discriminatory practice in the workplace that is either unlawful or that that the individual "reasonably believes to be unlawful." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005); *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

Johnson contends that the DJJ and Floyd gave her a poor performance evaluation because she complained about Hill. But she does not allege that she complained because Hill was discriminating against because of her race. Indeed, Johnson did not learn of the DJJ's allegedly favorable treatment of her white colleagues until after she first complained to Brooks about Hill. Moreover, she does not allege that she was participating in an ongoing investigation under Title

VII or § 1981. Thus, Johnson has not plausibly pled that she engaged in protected activity. Accordingly, the Court will dismiss Counts Twelve and Thirteen with prejudice.[11]

### D. Leave to Amend

Federal Rule of Civil Procedure 15 directs courts to "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts deny leave to amend if (1) amendment would prejudice the opposing party, (2) there has been bad faith, or (3) amendment would be futile. *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012).

In this case, the Court has already provided Johnson an opportunity to state an actionable claim for relief and to comply with the Federal Rules of Civil Procedure. Moreover, Johnson bases her complaint on a comprehensive settlement demand letter previous counsel sent to the defendants before Johnson filed this lawsuit. None of the additional facts included in previous counsel's letter would cure the deficiencies, and Johnson's complaint continues to fall short. Because any amendment would be futile, the Court declines to grant Johnson leave to amend.

### IV. CONCLUSION

For the foregoing reasons, the Court will dismiss this case pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and 28 U.S.C. § 1915(e)(2)(B)(ii).

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record and to the pro se plaintiff.

Date: 18 May 2020
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[11] Because the Court will dismiss all of Johnson's claims, it will not consider whether Johnson can recover attorney's fees.